OWEN A. TARR AND JERREL D. TARR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BERNARD H. KARLIN AND LYNN V. KARLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tarr v. Commissioner
Docket Nos. 33359-87, 36157-87
United States Tax Court
T.C. Memo 1990-360; 1990 Tax Ct. Memo LEXIS 377; 60 T.C.M. (CCH) 143; T.C.M. (RIA) 90360; July 17, 1990, Filed *377 Decisions will be entered under Rule 155. Robert B. Cohen, Kimberly R. Todt, and Jeffrey M. Siegel, for the petitioners. Robert E. Marum and John Aletta, for the respondent. CLAPP, Judge. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Owen A. Tarr and Jerrel D. Tarr -- Docket No. 33359-87
Interest and additions to tax under section
Year
Deficiency
6621(c) *
6653(a)(1)
6653(a)(2)
6661
1980
$  4,173
applicable
--
--
--
1981
15,597
applicable
--
--
--
1982
28,328
applicable
$ 1,416
50% of interest
$ 7,082
due on $ 1,000
1983
16,380
applicable
819
50% of interest
4,095
due on $ 500 Bernard H. Karlin and Lynn V. Karlin -- Docket No. 36157-87
Interest and additions to tax under section
Year
Deficiency
6621(c) *
6653(a)
6653(a)(1)
6653(a)(2)
6661
1979
$ 15,391
applicable
$ 770
--
--
--
1980
14,163
applicable
708
--
--
--
1981
29,131
applicable
--
$ 1,457
50% of interest
--
due on $ 1,400
1982
14,184
applicable
--
709
50% of interest
$ 3,546
due on $ 800  After concessions, the issues are (1) whether petitioners' purchase of dairy cattle should be respected for Federal income tax purposes; (2) whether petitioners' *378 dairy cattle activities were engaged in for profit within the meaning of section 183; (3) whether petitioners were at risk under section 465; (4) whether the Tarrs are entitled to a bad debt deduction for 1980; (5) whether petitioners are liable for additions to tax for negligence under sections 6653(a), (a)(1), and (2); (6) whether petitioners are liable for additions to tax under section 6661 for substantial understatements of their 1982 tax liability; and (7) whether petitioners are liable for increased interest under section 6621(c). All section references are to the Internal Revenue Code for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners resided in Connecticut when they filed their petitions. Petitioners in the plural refers to Owen A. Tarr and Bernard H. Karlin, Tarr refers to Owen Tarr, and Karlin refers to Bernard Karlin. Tarr grew up on a dairy farm, where his duties included caring for and milking the dairy cattle. After graduating from college in 1967 with a 2-year degree in dairy husbandry, he assumed management of Tarr *379 Farms, his family's dairy farms. In the early 1970's, Tarr Farms wanted to raise capital, so it sold its cows to National Cattle Company (National). Tarr Farms continued to care for the cattle, and in return retained a portion of the milk proceeds. As a result of his dealing with National, Tarr became acquainted with Karlin, a National employee who since 1969 had been involved with programs that sold cattle to investors. In 1972, Karlin formed his own company, Cattle Investors Corporation (CIC). In 1976, Tarr acquired an interest in CIC. In 1978, petitioners formed Cattle Investor's Management Corporation (CIMC). Subsequently, but before petitioners made their cattle purchases, all of the CIC and CIMC stock was acquired by Dairy Science Corporation, which was owned one-third by Tarr and two-thirds by Karlin. CIC purchased cattle for resale to investors, and CIMC managed the cattle for the investors. CIC and CIMC shared the same offices, had the same address, and had the same telephone number. They also had the same president (Karlin) and the same vice president (Tarr), but CIC had its own secretary and accountant, and CIMC had two individuals who helped manage the cattle. CIC *380 and CIMC filed separate income tax returns. Tarr purchased dairy cattle from CIC in September 1979, December 1981, and December 1982. Karlin purchased dairy cattle from CIC in September 1979 and December 1981. All purchases involved 40 cattle, except Tarr's 1982 purchase which involved 24 cattle. Both of the September 1979 purchases were made for prices of $ 60,000, consisting of downpayments of $ 7,500 and installment notes of $ 52,500 payable at 9-7/8-percent interest over 7 years. Tarr's actual downpayment at the time of purchase was $ 3,500, with the remaining $ 4,000 paid by December 1980. Karlin made no downpayment at the time of purchase but paid $ 3,500 in December 1979. Both of the 1981 purchases were made for prices of $ 66,000, consisting of downpayments of $ 10,000 and installment notes of $ 56,000 payable at 14-percent interest over 7 years. Tarr's actual downpayment at the time of purchase was $ 2,000, with the remaining $ 8,000 paid in March 1982. Karlin made no downpayment at the time of purchase but paid $ 10,000 in December 1982. Tarr's 1982 purchase was made for a price of $ 34,800, consisting of a $ 7,200 downpayment (paid at the time of purchase) and a *381 $ 27,600 note payable at 16-percent interest over 7 years. CIC retained a security interest in the cattle purchased by petitioners. Karlin made the following payments to CIC or CIMC at the following times: 12/31/79
$  3,500.00
12/31/79
11,286.47
4/7/80
8,497.18
4/16/81
17,430.52
12/17/81
5,371.92
12/8/82
10,000.00
12/8/82
34,605.06
12/29/83
30,777.40
Petitioners executed management agreements with CIMC for all purchases. The management agreements contained powers of attorney so that CIMC could act as petitioners' agent in the maintenance, care, and sale of the herds. The management agreements also provided that petitioners would pay CIMC a management fee, and that CIMC would pay petitioners a portion of the milk proceeds from the cows. For the 1979 and 1981 purchases, the annual management fee was $ 600 per cow and the annual milk proceeds were $ 400 per cow (approximately half of net milk receipts). For Tarr's 1982 purchase, the annual management fee per cow was $ 300 the first year, $ 350 the second year, and $ 675 each succeeding year, and the annual milk proceeds were $ 200 per cow. The management agreements also provided that CIMC would collect the amounts due CIC. If CIMC sold the cattle *382 for a petitioner's account at the termination of the agreement, it was entitled to a portion of the net proceeds from the sale. CIMC entered into farm management agreements with farmers who agreed to maintain and raise the cattle. The agreements had 7-year terms and provided that the farmers would annually pay the investors the milk receipts described above, and that CIMC would annually pay a $ 400 per cow management fee to the farmers. At the end of 7 years, petitioners were entitled to possession of a herd twice the size of the original herd, with the farmers keeping any excess offspring. The agreements also provided that at the expiration of the agreement the farmer had the right to purchase the cows at fair market value. In at least one instance, CIMC protected petitioners' interest in the cattle by requiring a farmer to execute a promissory note in favor of CIMC. The note was secured by a mortgage deed on the farmer's property and was payable upon default of the farmer's obligations under the farm management agreement. CIMC often would acquire cattle from petitioners for prices from $ 350 to $ 1,250, with petitioners reporting the proceeds of the sales on their income tax returns. *383 CIMC then would resell the cattle for $ 1 per animal to the farmers, who had previously sold them to third parties. Cattle prices increased from $ 300 in the early 1970's to around $ 1,200 in the late 1970's, and it was reasonable to expect continued increases in cattle prices. However, the removal of government price supports in 1982 or 1983 caused cattle prices to fall through 1985. In 1976 or 1977, Tarr had financial problems which caused him to ask Sam Berkowitz (Berkowitz), a cattle dealer, to auction off certain of his equipment and feed. Berkowitz did not, however, pay Tarr the $ 100,000 in auction proceeds. Instead, he paid Tarr approximately $ 21,000 in return for three promissory notes executed by Tarr. Berkowitz discounted the notes at Hartford National Bank and Trust Company and promised Tarr that he would make the payments on the notes. Berkowitz stopped making payments on the notes when the outstanding balance was approximately $ 11,500. After some negotiation with the bank, Tarr paid off his debt in May 1980. OPINION The issues are (1) whether petitioners' purchase of dairy cattle should be respected for Federal income tax purposes; (2) whether petitioners' dairy *384 cattle activities were engaged in for profit within the meaning of section 183; (3) whether petitioners were at risk under section 465; (4) whether the Tarrs are entitled to a bad debt deduction for 1980; (5) whether petitioners are liable for additions to tax for negligence under sections 6653(a), (a)(1), and (2); (6) whether petitioners are liable for additions to tax under section 6661 for substantial understatements of their 1982 tax liability; and (7) whether petitioners are liable for increased interest under section 6621(c). 1. Whether purchase respected for Federal tax purposes
Respondent first contends that petitioners did not acquire the benefits and burdens of ownership of the cattle. See . For example, he claims that petitioners did not have possession of the cattle, and that the farmers rather than CIMC selected the cattle to be placed on their farms. He also points to the farmers' sales of certain cattle to third parties during the term of the management agreement, and points out that CIMC would subsequently purchase these cattle from petitioners for several hundred dollars and sell them to the farmers for $ 1. For *385 these and other reasons, he concludes that ownership of the cattle always was with the farmers. Viewed in isolation, certain aspects of the transactions may look suspicious. For example, it is difficult to explain why CIMC would sell an animal to the farmers for $ 1, yet pay petitioners $ 350 to $ 1,250 for the same animal. However, viewing the forest rather than the trees, it is clear that petitioners owned a herd of cattle at the end of 7 years, and that this herd was twice the size of the herd that they originally purchased. Petitioners acquired the benefits and burdens of the ownership of their herds because they would have received the profits if cattle prices had continued to increase and did suffer the losses when cattle prices fell. It is irrelevant that excess cattle may have been owned by the farmers, as these excess cattle were merely payments in kind for the management services of the farmers. We conclude that petitioners received the benefits and burdens of their cattle transactions. Respondent next contends that the transactions lacked economic substance. However, Tarr convincingly testified that cattle prices went from $ 300 in the early 1970's to around $ 1,200 *386 in the late 1970's, and that it was reasonable to expect continued increases in cattle prices. In addition, petitioners expected their herds to double in size during the term of the management agreement. We conclude that petitioners had "a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits." . Thus, the transactions had economic substance. 2. Profit objective
Respondent next argues that petitioners had no profit objective, and thus that section 183 limits their deductions. However, we already have noted that petitioners had a reasonable opportunity for economic profit. In addition, Tarr was a life-long dairy farmer who believed that his investment was a way to acquire cattle of his own. Karlin was not a farmer, but we conclude that both he and Tarr entered the cattle transactions with a profit objective. See . 3. At-risk rules
Petitioners may deduct their losses from their dairy cattle activity only to the extent they were at risk. Sec. 465(a)(1). Generally, they were at risk with respect to money paid to CIC and CIMC, and to amounts borrowed *387 with respect to their investments for which they were personally liable for repayment. Sec. 465(b)(1) and (2). However, section 465(b)(3)(A) provides an exception for any amount borrowed from a person who has a relationship to the taxpayer specified by section 267(b). One such relationship is that between an individual and a corporation if the individual directly or indirectly owns more than 50 percent in value of the outstanding stock. Sec. 267(b)(2). Since Karlin indirectly owned over 50 percent of the CIC stock, he was not at risk with respect to the amounts he borrowed from CIC. Accordingly, he was at risk only with respect to the money he actually contributed to the activity. Tarr did not own over 50 percent of the CIC stock, so he is not subject to section 465(b)(3)(A). Respondent asserts, however, that Tarr is subject to section 465(b)(3)(A) because he borrowed from CIC, which is a person with an interest (other than an interest as a creditor) in the activity. A person with a capital interest or a net profits interest in the activity will have an interest other than as a creditor. ; . CIC *388 had no capital interest because it had no interest in the dairy herds which would be distributable to it upon liquidation of the activity. See . Similarly, CIC had no interest in the net profits of the activity because the payments it received were unrelated to net profits. Respondent points out, however, that CIMC was entitled to a portion of the net proceeds of the sale of the cattle, and he asserts that this interest was a net profits interest. He also claims that CIC and CIMC should be viewed as a single entity, so that Tarr would have borrowed an amount from an entity with an interest other than as a creditor in the cattle activity. We need not address the issue of whether net proceeds are net profits because it is clear that CIC and CIMC were not a single entity. They had different functions in the cattle program, had different employees, and filed separate Federal tax returns. We hold that Tarr was at risk with respect to both his cash contributions and his notes. Respondent also asserts that "amounts were protected against loss through nonrecourse financing, guarantees, stop loss agreements, or similar arrangements" because petitioners had *389 no realistic possibility of economic loss. Sec. 465(b)(4). In fact, however, petitioners did suffer a loss because cattle prices did not continue to appreciate as they had expected. 4. Tarr's bad debt deduction
Tarr claims a $ 11,550 bad debt deduction under section 166 for his payment of a debt to Hartford National Bank and Trust Company. This debt arose from Berkowitz's sale of Tarr's equipment and feed. When Berkowitz failed to remit the proceeds of the sale, Tarr may have had a potential tax loss equal to his basis in the equipment and feed. However, Tarr has not shown that he had any basis in the equipment or feed. Sec. 166(b). After failing to receive the funds from the auction, Tarr gave Berkowitz three promissory notes and received $ 21,000 in return. Berkowitz, pursuant to an oral agreement, made several payments to the bank on the discounted note. These payments appear to be, in effect, payments to Tarr on account of the equipment and feed. When Berkowitz failed to make the remaining payments on Tarr's note, Tarr repaid $ 11,550 of the loan he previously received. This repayment did not cause Tarr to have a tax loss. Tarr testified that he reported as income the approximately *390 $ 21,000 he borrowed from Berkowitz, but this alone without further explanation does not entitle him to a bad debt deduction. 5. Section 6653
Negligence under section 6653(a) is the lack of due care or failure to act as a reasonable person would act under the same circumstance where there is a legal duty to act. . Tarr did not address the negligence issue on brief, so he has failed to carry his burden of proof with respect to the portion of the deficiency that he conceded. Rule 142(a). Karlin took deductions that were not allowed by the at-risk rules. A reasonable person would not have so acted, so Karlin is liable for the section 6653(a) additions to tax. 6. Section 6661
When making the Rule 155 computations, the parties will have to determine whether the mechanical requirements of section 6661 apply to either petitioner. If so, the section 6661 addition to tax will apply. Section 6661(b)(2)(B) will not relieve either petitioner of liability because there was neither substantial authority for petitioners' tax treatment of any disallowed items nor adequate disclosure of the facts affecting the tax treatment of the disallowed items. *391 7. Section 6621(c)
Respondent determined that both petitioners are liable for the section 6621(c) increased interest rate on substantial underpayments attributable to tax-motivated transactions. None of the tax-motivated transactions listed in section 6621(c)(3)(A) apply to Tarr. However, a portion of Karlin's loss was disallowed under section 465, so he had tax-motivated transactions. Sec. 6621(c)(3)(A)(ii). When the parties make the Rule 155 computations, they will have to determine whether the amount of Karlin's underpayment attributable to his tax-motivated transactions exceeds $ 1,000 for any years. If so, he is liable under section 6621(c) for those years. Decisions will be entered under Rule 155. Footnotes
*. Formerly section 6621(d).↩
*. Formerly section 6621(d).↩